SHIPMAN et al. v. GLYNN et al.

(Supreme Court, Appellate Division, Fourth Department. June 18, 1898.)

1. APPEAL—FINDINGS OF REFEREE—CONCLUSIVENESS.
    Where defendant testified to having executed a bond and mortgage under threat of prosecution and imprisonment for larceny, and plaintiff and his attorney, who had been present, denied such threats, the finding of the referee for plaintiff is conclusive.

2. EVIDENCE—ACCOUNT BOOKS—WHEN ADMISSIBLE.
    Plaintiff, a wholesale coal dealer, testified that coal was shipped direct to his customers by the miners to whom orders were forwarded, and

that, from notices containing particulars of each shipment, his "invoice book" was made up, and the price added, and then posted into his ledger, and charged to the account of the customer, and that the entries were correct. The entries were made by three different bookkeepers, none of whom had personal knowledge of the correctness of all the items charged. All of such bookkeepers had left plaintiff's employ, and their whereabouts were unknown, one of them being reported dead. It was not shown that the other two were dead or out of the court's jurisdiction, and no effort was made to produce them. In addition to coal charged, the books contained entries of payments by customers therefor, and also notes charged and payments thereon. Witnesses who dealt with plaintiff, and settled on his books, testified that the books were honestly kept. *Held*, that the books were not admissible for lack of a proper foundation and want of verification.

Appeal from judgment on report of referee.

Action by Chauncy N. Shipman and others against Patrick Glynn and another. There was a judgment for plaintiffs, and defendants appealed. Reversed.

The defendants had executed a bond and mortgage to the plaintiffs to secure a claim of $2,500. The property mortgaged was situate in Niagara Falls, N. Y. The defendants answered, alleging that the bond and mortgage were obtained by the plaintiffs by means of threats of arresting Patrick Glynn, and imprisoning him for larceny. The defendant Mary Ann Glynn is his wife. The answer also alleged payment and a counterclaim. The referee found that there was due on the bond and mortgage at the time of his report $1,603.53, and awarded costs to the plaintiffs, and directed that judgment of foreclosure and sale of the mortgaged premises be entered.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

P. F. King, for appellants.

S. J. Lawrence, for respondents.

WARD, J. For several years prior to December 2, 1890, Charles Glynn, a son of the defendants, and one McDonald, as co-partners, were carrying on a retail coal business at the city of Niagara Falls. At that date, Charles Glynn died, and his interest in the co-partnership was assumed by Patrick Glynn, and the business was continued by Patrick and McDonald until on or about the 10th of November, 1891, when the partnership was dissolved. The plaintiffs were wholesale coal dealers, transacting their business at Buffalo, N. Y. They supplied coal to the Niagara Falls concern until the 10th of November aforesaid, when the plaintiff Shipman went to Niagara Falls, saw the defendants, and insisted upon their executing a bond and mortgage, to secure the plaintiffs, of $2,500 for coal sold and delivered to the concern. The defendants testified that they executed the bond and mortgage because of threats made by the plaintiff Shipman to have Patrick arrested for larceny unless they did so. This was denied by Shipman, and by his attorney, who was present when the threats were claimed to have been made; and the referee has found with the plaintiffs upon this question, which we regard as conclusive.

The chief controversy was over the defense of payment of this bond and mortgage. The evidence of the defendants tended to show full payment. The plaintiffs' evidence tended to support the opposite conclusion. The appeal presents questions of fact in which the de-

fendants insist the preponderance of evidence was so decidedly with them that this court should reverse the judgment. Especially do they insist that five notes that were afterwards given by the defendants for an amount which the defendants claim was due upon the bond and mortgage, and for the same debt, were paid by them before the commencement of the action. There is some force in this contention, but the plaintiff Shipman gave testimony disproving the payment of these notes; and, as we have reached the conclusion that we must grant a new trial upon exceptions taken to the admission of evidence, we will not discuss the questions of fact further.

Numerous exceptions were taken by the defendants' counsel to the reception of evidence against them upon the trial, which are also urged upon this review, and which we have carefully examined; but we do not find that any of them present reversible error, except those which relate to the admission of the plaintiffs' books of account, which contained the plaintiffs' charges for coal sold and delivered and credits of payment thereon. Before the books were offered in evidence, the plaintiffs proved by two witnesses who had dealt with the plaintiffs' and settled with them to some extent upon these books, that they kept honest books. It was also shown that a portion of the coal charged upon these books had been delivered to the defendant Patrick Glynn (who carried on the coal business after the dissolution of the partnership of McDonald & Glynn), from railroad cars that had brought the coal from where it had been mined in Pennsylvania. The only other evidence given by the plaintiffs preliminary to offering the books in evidence was that of the plaintiff Shipman. He presented at the trial two books, one of which he called a "ledger," and the other an "invoice book." The plaintiff Shipman testified that the invoice book was a book of original entry; that the defendants' account on this book showed shipments of coal until July 10, 1892. The mode of making up the books was as follows: On receiving an order for the coal from Glynn & McDonald, or from the defendant Patrick Glynn, the plaintiffs would send the order to the mines in Pennsylvania, with a request to the mine owners to fill the order; and, when the order was filled, the mine owner would send notice to the plaintiffs in Buffalo of the shipment, the car, number, weight, and size of the coal, and the name of the consignee. From that the plaintiff would invoice and take a copy of that invoice from these books, and send it to the consignee, and then post the account from the invoice book to the ledger, and send a bill thereof with every car load, to the consignees. The coal, in fact, never came into the possession of nor was seen by the plaintiffs or any of their agents or book-keepers. The price of the coal was fixed by the plaintiffs themselves, and the books in question, in addition to what has been stated, contained the price of the coal as charged and cash entries of payments, and also entries of notes given and paid by the defendants. He testified that the books were made up by three different bookkeepers, two of whom were ladies that had left the plaintiffs' employment before the action was tried, and their whereabouts were unknown to the plaintiffs. The other was a man who was also absent, and whose place of residence, if living, was unknown. Shipman testified that

he had heard that the man was dead. None of these bookkeepers were produced upon the trial as witnesses, nor was it shown that either of the ladies was dead or without the jurisdiction of the court, or that any attempt had been made to procure any of these bookkeepers upon the trial. The plaintiff Shipman also testified as to his conclusion that he knew when these entries were being made, and that they were correct. On his cross-examination this plaintiff stated:

"I did not write up the books. I know in whose handwriting this account was kept. It was kept at the city of Buffalo,—all of it; and the coal kept by the books was never inspected by the bookkeeper. The shippers at the mines sent us communications from the mines, from which we made our invoices. Personally I know nothing about the correctness of the coal and cars except from the invoices. The parties shipping the coal are not in my employ. They belong to another company, and no person in my employ had anything to do with the shipping of the coal."

The defendants' counsel objected to the reception of these books as improper, incompetent; that no proper foundation was shown for their introduction, and that it had not been shown that they had been correctly kept by the person or persons who did actually keep them; that the bookkeepers who kept the books were not produced, and no effort made by the plaintiffs to produce them as to the correctness of the books. The referee overruled these objections, to which the defendants excepted. The counsel for the plaintiffs asked the following question: "Turn to book of account of November 10, 1891, and show the payments made by the defendants, and the amount now due." This was objected to as incompetent and improper, and that it was hearsay. This objection was overruled, to which the defendants excepted, and the witness stated that the aggregate amount of payments was $3,975.95. Then a question by the plaintiffs' counsel: "What is the balance to be applied upon the mortgage after deducting the amount paid for coal in accordance with the agreement?" This was objected to as above, objection overruled, and defendants excepted, and the witness answered that the amount to be applied on the mortgage was $900, and the amount then due on the mortgage after applying payments was $1,785.08, including interest up to July 1, 1895. The books therefore became very important evidence, and evidence made by the plaintiffs themselves or their employés. The amount of the coal, weight, and everything concerning it, except the price, were obtained entirely from the statements of the mine owners, and were hearsay. Fixing the price of the coal, and entering upon the books, were the acts of the plaintiffs. The cash items of credit, notes, and all matters which went to make up the defendants' side of the account were entered upon these books by the bookkeepers, without any direction or authority from the defendants. The plaintiffs, in effect, put their whole case, so far as the defense of payment was concerned, upon their own books, struck a balance, and testified from such books to that balance.

We are referred to no authority authorizing the admission of this evidence. Books of account are sometimes permissible in evidence, although they are the act of an interested party, when they are books of original entry; when the party kept no clerk; when they related

to transactions within the knowledge of the persons making the entries; where they are entered at the time that the transaction to which they relate occurred; when some of the articles charged for were delivered; when it was shown that the party kept honest books. In some instances, where the entries were made by bookkeepers of transactions within the knowledge of the bookkeeper, and such bookkeeper is called to verify the entries, or if these persons were dead or beyond the jurisdiction of the court, and their handwriting proved, or the fact proved by other witnesses that they made the entries, the entries were held to be competent, but not as to cash items; not as to any matter dependent upon hearsay or information derived from third persons who were not sworn. Judged by these rules, the objection as to the reception of these books and their contents in evidence was fatal; and this view is amply sustained by the following authorities: Vosburgh v. Thayer, 12 Johns. 462; Gould v. Conway, 59 Barb. 355; Ives v. Waters, 30 Hun, 297; Dooley v. Moan, 57 Hun, 535, 11 N. Y. Supp. 239; Davis v. Seaman, 64 Hun, 574, 19 N. Y. Supp. 260; Smith v. Rentz, 131 N. Y. 169, 30 N. E. 54; Sterrett v. Bull, 1 Bin. 234; Stiles v. Homer, 21 Conn. 507; 1 Whart. Ev. (3d Ed.) §§ 240, 245, 681, 685.

The judgment should be reversed, and a new trial ordered before another referee, with costs to the appellants to abide the event. All concur.